IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) NO. 3:17-cr-00147 |
| v. | ) JUDGE RICHARDSON |
| | ) |
| LORENZO SHELTON | ) |

## **MEMORANDUM OPINION**

Before the Court is Defendant's Motion to Suppress (Doc. No. 47). The Government filed a response in opposition (Doc. No. 53). On December 10, 2018, the Court held an evidentiary hearing on the motion. Thereafter, the parties filed post-hearing briefs (Doc. Nos. 87, 92). For the reasons discussed below, Defendant's Motion to Suppress will be denied.

## **FACTUAL FINDINGS[1]**

On October 26, 2015, when preparing for release on parole from a Tennessee prison, Defendant signed a Parole Certificate that contained conditions of his parole. (Government Exhibit 1; Doc. No. 80 ("Tr.") at 96-98.) One of the conditions stated, "I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time without reasonable suspicion." (Government Exhibit 1.)

From May 2016 to November 2016, Defendant's assigned Parole Officer was Michael Pasqualetto. (Tr. at 94.) On July 11, 2016, Defendant provided a required Monthly Reporting Form to Officer Pasqualetto. (*Id.* at 98-99; Government Exhibit 2.) The Monthly Reporting Form stated

---

[1] The Court makes these factual findings based on the cited testimony from the suppression hearing (as set forth in the hearing transcript, Doc. No. 80). In relying on specific cited testimony in this order, the Court has determined that it is credible for one or more reasons, including, for example, that it was delivered by the witness in a credible manner, was uncontradicted by any other evidence, was not successfully impeached, is inherently uncontroversial or otherwise believable, and/or was supported at least generally by other evidence.

1

that Defendant's residential address was 317 Tillman Lane, Nashville, Tennessee. (Tr. at 99; Government Exhibit 2.)

On August 4, 2016, Officer Pasqualetto went to 317 Tillman Lane with a team of parole officers to conduct a parole search, which was prompted by a phone call he had received approximately one week earlier and a second call he had received a day or two earlier. (Tr. at 102-07.) When the parole officers arrived at the Tillman address, they encountered an individual who informed them that Defendant was not home. (*Id.* at 108.) Officer Pasqualetto then called Defendant, who answered the phone, and Defendant agreed to meet Officer Pasqualetto at the residence. (*Id.* at 108-09.) Defendant arrived shortly thereafter and encountered Officer Pasqualetto in the front yard. (*Id.* at 109-11.)

Officer Pasqualetto then informed Defendant that he was going to perform a search. (*Id.* at 111.) Defendant responded by stating that he had moved out two weeks ago to another residence. (*Id.* at 111-12.) Defendant provided Officer Pasqualetto with an address that "had some threes in it" and the street name "Chesapeake." (*Id.* at 112.) When asked where he had been living at the Tillman address, Defendant responded that he had been living in the basement. (*Id.*) Officer Pasqualetto asked Defendant for consent to search the Tillman address, and Defendant provided consent. (*Id.* at 115.)

The officers then looked in the basement and noted that it showed no sign of any recent habitation. (*Id.* at 115-16.) Defendant was again asked which room was his, and he did not change his answer. (*Id.* at 116.) The officers next went into a bedroom and found Defendant's driver license, mail, and Officer Pasqualetto's business card. (*Id.* at 118-19.) Officer Pasqualetto picked up the comforter on the bed and three bags of heroin fell out of it. (*Id.* at 118-20.) A scale was also found in that bedroom. (*Id.* at 118.) Metro Nashville Police Department ("MNPD") officers at

some point arrived to assist because they, and not parole officers, can seize contraband and collect evidence. (*Id.* at 75, 106, 122, 148, 174.)

MNPD Officer Ryan Cagle placed Defendant under arrest and searched his person incident to that arrest. (*Id.* at 27.) Pursuant to that search, Officer Cagle seized Defendant's keys from his clothing pocket. (*Id.* at 27.) Parole Officers Haley Howell and Tiffany Rodd searched Defendant's vehicle. (*Id.* at 172.) From the vehicle, they recovered several cell phones and a box containing a large sum of cash. (*Id.* at 173-74, 216.)

While the search was taking place, Defendant was seated on the front porch. (*Id.* at 174.) Officer Howell noticed that Defendant had his cell phone in his hand and was in the process of sending a message, which appeared to be instructing another person to hide something. (*Id.* at 175.) Officer Howell called to someone to take the phone out of Defendant's hands. (*Id.* at 175.) Officer Rodd then looked at text messages and photographs on the phone. (*Id.* at 219.) While Officer Rodd was handling the phone, the same number repeatedly called and sent text messages to the phone. (*Id.* at 219-20.)

Officer Rodd then gave the phone to MNPD officers. (*Id.* at 24, 220.) When Defendant's phone was handed to Detective Seth England, it was opened to the number that Officer Rodd had observed calling and texting Defendant. (*Id.* at 24.) Detective England gave the phone to Detective Bobby Young who ran it through a Nashville Electric Service ("NES") database on his laptop. (*Id.*) Officer Pasqualetto had already relayed to Detective England that Defendant had provided an address for an additional residence on Chesapeake, albeit apparently one with a street number that could not possibly have matched an actual address on Chesapeake because it did not have enough digits. (*Id.* at 24, 122-23.) Detective England testified that the street name provided was Chesapeake but that the number provided had three digits even though all addresses on Chesapeake

3

have four or more digits. (*Id.* at 24.) The officers decided to run the number through an NES database to see if it would "come back to potentially anybody that he might be staying with or any addresses in relation to the case." (*Id.*) The number was found to be associated with an address on Chesapeake. (*Id.* at 25-26, 136-37.)

Based on this information, Officers Howell and Rodd determined that Defendant was also possibly residing at a secondary address on Chesapeake, and that there may be a risk that evidence was being destroyed at that address. (*Id.* at 177-78, 222.) Officers Howell and Rodd went to that address, followed by MNPD officers. (*Id.* at 178.)

When Officers Howell and Rodd arrived at 3565 Chesapeake Drive, Officer Howell knocked on the door. (*Id.* at 179.) An individual, who appeared to be a minor, answered the door. (*Id.*) The officers asked whether an adult was home, and a woman (the "twenty year-old female") came to the door who stated that she was twenty years old. (*Id.* at 179-80.) That individual stated that Defendant had been "staying" at the residence for approximately two weeks. (*Id.* at 180, 224.) Officers entered the residence and were directed towards a locked bedroom. (*Id.* at 180-81.) A key on Defendant's key ring that was taken from his person was used to unlock the door. (*Id.* at 40-41, 181, 224-25.) Parole officers entered the room and began to search. (*Id.* at 182, 225.) Officer Howell found a shoebox containing heroin and scales. (*Id.* at 182.) Officer Rodd recovered a box full of money and a handgun. (*Id.* at 183, 225.)

The fruits of the August 4, 2016 search of 317 Tillman Lane form the basis of Count One (possession with intent to distribute 100 grams or more of heroin). (Doc. No. 1.) The fruits of the August 4, 2016 search of 3565 Chesapeake Drive form the basis of Count Two (possession with intent to distribute a detectable amount of heroin), Count Three (felon in possession of a firearm), and Count Four (possession of a firearm in furtherance of a drug trafficking crime). (*Id.*) Defendant

has moved to suppress the contraband found at both locations as well as Defendant's statement that he had moved out of the Tillman address two weeks ago to an address that "had some threes in it" and was off Chesapeake.

## DISCUSSION

I.  **Search of 317 Tillman Lane**

For the purposes of this motion, the Court assumes, without deciding, that Defendant has standing to challenge the search of 317 Tillman Lane.[2] A person serving the remains of his sentence on parole has limited protections under the Fourth Amendment. *See Samson v. California*, 547 U.S. 843, 856 (2006). Defendant argues that the Court should apply the two-part test set forth in *United States v. Doxey*, 833 F.3d 692 (6th Cir. 2016) to determine whether the search violated Defendant's Fourth Amendment rights. In *Doxey*, the Sixth Circuit stated that a two-step test applies to evaluate the search of a parolee. *Id.* at 703. The Sixth Circuit examines whether: (1) the relevant regulation or statute pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement; and (2) the facts of the search itself satisfy the regulation or statute at issue. *Id.* at 703-04. This is not the correct standard to apply here. As the Government aptly asserts, the two-part test Defendant discusses applies when the search is made pursuant to a state policy. *See United States v. Tessier*, 814 F.3d 432, 433 n.1 (6th Cir. 2016). Where, as here, the search was made pursuant to a condition of probation, the test set forth in

---

[2] To the extent the Court references Defendant's "standing" herein, it is not "standing" in the sense of being jurisdictional or rooted in Article III but instead "is more properly subsumed under substantive Fourth Amendment doctrine." *Rakas v. Illinois*, 439 U.S. 128, 139 (1978). "In other words, for a defendant to argue successfully that evidence should be suppressed, he must show, as an element of his claim, that the government infringed upon his Fourth Amendment rights." *United States v. Noble*, 762 F.3d 509, 526 (6th Cir. 2014). The term "standing" as used herein refers to the existence (or lack thereof) of personal Fourth Amendment rights in the locations searched—meaning, as discussed *infra*, the existence (or non-existence) of an objectively reasonable expectation of privacy for Defendant in those respective locations.

*United States v. Knights*, 534 U.S. 112 (2001) applies. *See id*. ("*Griffin* governed our inquiry in *Henry* because the search was made pursuant to a state policy, but *Knights* governs our inquiry here because the search was made pursuant to a condition of probation.").

Under the general Fourth Amendment approach, the Court examines the totality of the circumstances to determine whether a search is reasonable within the meaning of the Fourth Amendment. *See Knights*, 534 U.S. at 118 (internal quotation marks and citation omitted). "[T]he reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 118-19 (internal quotation marks and citation omitted). In *Knights*, the Supreme Court found that the probationer at issue had a "significantly diminished" reasonable expectation of privacy because the search condition was clearly expressed in his probation order and he was unambiguously informed of it. *Id.* at 119-20. In *Samson v. California*, 547 U.S. 843 (2006), the Supreme Court explained that parolees have an even further diminished reasonable expectation of privacy than do probationers. *Id.* at 850. The Supreme Court held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id.* at 856.³

---

³ Defendant discusses *State v. Stanfield*, No. W2015-02503-CCA-R3-CD, 2017 WL 1205952 (Tenn. Crim. App. Mar. 31, 2017) to support his argument. The Court does not find his reliance on *Stanfield* persuasive because the Tennessee Supreme Court overruled the part of that opinion addressing the search of a parolee's residence, holding:

> The Court of Criminal Appeals erred in concluding that once the officers entered the residence and determined that the source of the suspicious noise was due not to nefarious conduct but to a rambunctious canine, the exigency no longer existed, and the officers should have halted. This analysis ignores the salient circumstance that this defendant enjoyed a lessened expectation of privacy due to his parolee status. Moreover, the intermediate court's

6

The record establishes that on October 25, 2015, Defendant signed a Parole Certificate which explicitly provided: "I agree to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement, at any time without reasonable suspicion." (Government Exhibit 1.) Defendant concedes that he was on parole and subject to the above conditions. (*See* Doc. No. 48 at 1.) Based on this evidence, the Court finds that the search of 317 Tillman Lane was a reasonable parole-authorized search. As discussed in the above cited case law, there is a significant government interest in combating recidivism and thwarting illegal drug activity by parolees. There is no evidence in the record indicating circumstances that would render the search unreasonable in a constitutional sense.

Defendant appears to suggest that the search of 317 Tillman Lane was not conducted to address legitimate law enforcement concerns. Defendant has failed to point to any direct or strong circumstantial evidence that this was the case, and the Court does not find any such evidence in the record. Accordingly, the Court will deny Defendant's motion to suppress evidence seized from 317 Tillman Lane.

## II.    Search of 3565 Chesapeake Drive

The Fourth Amendment provides that persons shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To have standing to contest a search under the Fourth Amendment, a defendant must show that "he had a legitimate expectation of privacy in the area searched or items seized." *United States v. Mathis*, 738 F.3d 719, 729 (6th Cir. 2013). To establish such an expectation, the defendant must show that:

---

conclusion ignores . . . *Samson* . . . which authorized the warrantless search based upon Winsett's parolee status alone.

*State v. Stanfield*, 554 S.W.3d 1, 11 (Tenn. 2018) (internal citation omitted). The Court notes that *Stanfield* was overruled after Defendant filed his brief.

(1) he had a subjective expectation of privacy, and (2) his expectation was objectively reasonable. *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009). An expectation is objectively reasonable only when it is one that society is prepared to recognize as legitimate. *Id.* at 283. The defendant has the burden of establishing the standing necessary to assert a Fourth Amendment violation by a preponderance of the evidence. *United States v. Ponder*, 240 F. App'x 17, 19 (6th Cir. 2007); *United States v. Rush*, 352 F. Supp. 2d 383, 385 (E.D.N.Y. 2005) (citing *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991)). Courts determine whether a legitimate expectation of privacy exists in a particular place or thing on a case by case basis. *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005). Whether a legitimate expectation of privacy exists is to be determined based on the totality of the circumstances. *United States v. Silva*, 247 F.3d 1051, 1055 (9th Cir. 2001); *Jones v. Lewis*, 874 F.2d 1125, 1131-32 (6th Cir. 1989). The factors to be considered in determining whether there was a legitimate expectation of privacy include ownership, lawful possession, or lawful control of the premises searched. *United States v. Hunyady*, 409 F.3d 297, 301 (6th Cir. 2005).

In *Minnesota v. Olson*, 495 U.S. 91, 96-99 (1990), the Supreme Court held that overnight status alone is sufficient to demonstrate that a defendant has a legitimate expectation of privacy in the home of another. In *Minnesota v. Carter*, 525 U.S. 83, 89 (1998), the Supreme Court distinguished *Olson*. In *Carter*, the persons seeking the protection of the Fourth Amendment were present in the home searched, not as overnight guests, but for "a matter of hours" to conduct a drug transaction. *Id.* at 90. No previous relationship with the householder and no other purpose for the visit existed. *Id.* For those visitors, the home was "simply a place to do business." *Id.* The Supreme Court recognized that, for Fourth Amendment purposes, property used for commercial purposes is treated differently, and accorded less protection, than property used as a residence. *Id.* The

Supreme Court stated that if the overnight guest in *Olson* is an example of those who may claim the protection of the Fourth Amendment in the home of another, and one who is merely on the premises legitimately is an example of those who may not, the case before it in *Carter* was somewhere in between. *Id.* The Supreme Court found that "the purely commercial nature of the transaction engaged . . . the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder . . . [lead to the conclusion] that respondents' situation is closer to that of one simply permitted on the premises" and therefore the visitors had no legitimate expectation of privacy in the premises. *Id.* at 91.

Interpreting the previously discussed Supreme Court decisions, the Sixth Circuit held in *United States v. Heath*, 259 F.3d 522 (6th Cir. 2001) that the defendant had a legitimate expectation of privacy in an apartment based on several indications of "acceptance into the household," including his status as an overnight guest as often as once a week over a period of two years, his possession of a key to the apartment which afforded him unfettered access to the premises and the ability to exclude and admit others, and his familial relationship with the householder. *Id.* at 532-33. Similarly, in *United States v. Pollard*, 215 F.3d 643 (6th Cir. 2000), the Sixth Circuit concluded that the defendant had standing to challenge the search of another's home because, *inter alia*, he had been friends with the lessee for approximately seven years, occasionally spent the night there, kept some personal belongings in a living room closet, ate meals with the family during visits, and was permitted to stay in the home even when the residents were not present. *Id.* at 647-48. In addition, the Sixth Circuit found in *United States v. Ellis*, 125 F. App'x 691 (6th Cir. 2005) that the defendant had a legitimate expectation of privacy in the searched location—the house of the

defendant's daughter—because it was one of two places the defendant stayed, and he spent a few nights there before the search. *Id.* at 696.[4]

At the opposite end of the continuum, the Sixth Circuit has held that a casual, transient visitor does not have standing to challenge a search of the premises. In *United States v. Harris*, 255 F.3d 288 (6th Cir. 2001), the defendant, who had been involved in selling drugs from the residence, conceded that he was merely a casual non-overnight visitor to the house searched. *Id.* at 294. The court found no legitimate expectation of privacy. *Harris*, 255 F.3d at 295. In *United States v. Berryhill*, 352 F.3d 315 (6th Cir. 2003), the Sixth Circuit also denied standing based upon the district court's finding that the defendant did not intend to stay overnight. *Id.* at 317. The defendant did not possess any of the items that would be expected of an overnight guest—"[h]e carried no clothes or toothbrush; indeed, the only bag in his possession contained materials for manufacturing methamphetamines." *Id.* at 317.

Factors that courts have considered to determine whether a defendant has a reasonable expectation of privacy in the place searched include: whether the defendant lived or was an overnight guest in a dwelling,[5] how often and for how long the defendant stayed in the

---

[4] The Court further notes that the Sixth Circuit has stated that it has "generously construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents." *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) (citing *Pollard*, 215 F.3d at 647-48). In certain cases, the Sixth Circuit has even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence. *See United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (holding that a transient person who was never an overnight guest had a reasonable expectation of privacy in a friend's apartment where he showered, changed clothes, and kept some personal possessions).

[5] *See, e.g.*, *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000) (holding an occasional overnight guest who slept on the couch, sometimes ate meals with the family, was allowed to stay in the house when the residents were gone, and who kept belongings in a living room closet had standing under the Fourth Amendment).

dwelling,[6] whether the defendant maintained personal belongings in the residence,[7] whether the defendant provided any sort of remuneration for the privilege of staying there,[8] whether the defendant could come and go freely,[9] the defendant's relationship to the host,[10] and whether the Defendant had the right to exclude others or evidence manifesting an intent to exercise this right.[11] The Court believes that too many unanswered questions remain for the Court to conclude that Defendant had a legitimate expectation of privacy in 3565 Chesapeake Drive. These questions include:

- Does the individual's statement that Defendant "stayed" at 3565 Chesapeake Drive mean that Defendant lived or stayed overnight there? Although Detective England's statement in his affidavit in support of the arrest warrants can be interpreted to assert that "staying" means living (*see* Defendant Exhibit 1), the Court is unaware of any evidence in the record

---

[6] *See, e.g.*, *United States v. Heath*, 259 F.3d 522, 533 (6th Cir. 2001) (determining that defendant had standing to contest the search of his cousin's apartment, because in addition to the familial relationship, the defendant had stayed there weekly for two years and had a key and "unfettered access" to the apartment.

[7] *See, e.g.*, *United States v. Robertson*, 297 F. App'x 722, 726 (10th Cir. 2008) (holding that a defendant had no reasonable expectation of privacy when the hotel room was not registered in his name and "no personal items indicating an overnight stay were present").

[8] *See, e.g.*, *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (holding that a defendant had no expectation of privacy where the defendant was squatting in building and did not pay rent to the owners of the structure).

[9] *See, e.g.*, *United States v. Davis*, 932 F.2d 752, 756-57 (9th Cir. 1991) (holding that a defendant had a reasonable expectation of privacy in the apartment where he, *inter alia*, had a key to it, could come and go freely, and stored items in it).

[10] *See, e.g.*, *United States v. Fields*, No. 09-20019-STA, 2010 WL 11464150, at *5 (W.D. Tenn. June 24, 2010), *aff'd*, 515 F. App'x 363 (6th Cir. 2013) ("Because the Defendant was the occupant's boyfriend and invited guest, Defendant had paid for the room and obtained a room key, and Defendant had visited Perkins at the same motel on prior occasions, the Court finds that Defendant did have a legitimate expectation of privacy in the room.").

[11] *See, e.g.*, *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988) (holding that a defendant did not have standing because, *inter alia*, he did not present evidence showing that he had a right to exclude others from the apartment and because the defendant did not show that he took precautions to insure his privacy in any area of the apartment).

- on this issue—such as evidence of personal belongings, receipt of mail, or car parked outside the residence—indicating that Defendant lived or stayed overnight at 3565 Chesapeake Drive.

- How often did Defendant "stay" at 3565 Chesapeake Drive? The Court cannot determine the answer to this question from the uncorroborated statement of the twenty year-old female who stated that Defendant stayed at 3565 Chesapeake Drive from "time to time." (Tr. at 238.)

- What was the basis of her purported knowledge that Defendant "stayed" there? At most, the Court can only infer two alternative possible bases: (a) acquaintance with the identity of Defendant and personal observation of his presence on site; and/or (b) second-hand information conveyed by someone else, perhaps her mother (inasmuch as she told the officers that Defendant had been dating her mother). It is unclear which of these (if either) was the ostensible basis. The record does not reflect any basis for knowledge or the soundness of any such basis.

- When was the last time Defendant "stayed" at 3565 Chesapeake Drive? Defendant fails to discuss, and the Court is unaware of any evidence in the record, on this issue.

- Were any personal belongings of Defendant present in 3565 Chesapeake Drive? Defendant fails to discuss, and the Court is unaware of any evidence in the record on, this issue.[12]

- Was Defendant an owner or lessor of 3565 Chesapeake Drive? Was Defendant providing the twenty year-old female, her supposed mother, or anyone else any compensation in return for staying at 3565 Chesapeake Drive? Again, there is a deficiency in the record on this issue.

- Although the record states that Defendant "*had* recently *been* dating" the mother of the individual who spoke with the officers (Tr. at 238) (emphasis added), what was the nature (including whether it can be considered personal or business and the the length of time) of Defendant's relationship with the mother at the time of the search? Again, the record contains no evidence on this issue.

- Was Defendant able to come and go into the residence freely? Once again, no evidence.

- Did Defendant have the right to exclude others from the residence and/or any part of it, including the particular room in which the officers conducted the search at issue? Again, there is no evidence.

---

[12] Defendant points out that the closet in which the items were located contained only women's clothing. (Doc. No. 87 at 5 (citing Doc. No. 47-2 at 42).)

The only relevant information about which the Court can be reasonably sure is the following: (1) in a room at 317 Tillman, officers found documents belonging to Defendant, together with male clothing and shoes; (2) at 317 Tillman Lane, Defendant told the parole officers that he had moved to a particular address on Chesapeake (likely not 3565 Chesapeake and perhaps not an actual existing street address at all) for about two weeks (Tr. at 24, 112); (3) the individual who spoke with the officers at the door at 3565 Chesapeake Drive, told the officers that Defendant had "been staying there" and dating her mother (*Id.* at 202, 238); (4) Detective England stated in his arrest warrant that Defendant "stays at" 3565 Chesapeake Drive (Defendant Exhibit 1); (5) Defendant had a key to the room at 3565 Chesapeake Drive in which the search was conducted (Tr. at 40-41, 181, 224-25.); (6) in the room at 3565 Chesapeake Drive, the officers found a picture (or two) of Defendant (*Id.* at 46; Government Exhibits 26-27) ; and (7) in the room at 3565 Chesapeake Drive, the officers found evidence suggesting the carrying of a heroin-trafficking business, namely heroin, scales, cash, and a gun (*Id.* at 182-83, 225).

Albeit a close call, the Court finds that Defendant has not met his burden to establish standing. The exhaustive list of questions that the Court discusses above are one indication that Defendant has failed to provide enough evidence to the Court to demonstrate standing by a preponderance of the evidence.[13] Moreover, the evidence Defendant has in fact submitted to the Court, discussed above, falls short of establishing an expectation of privacy in 3565 Chesapeake Drive. The evidence amounts to: (a) terse, out-of-court statements from Defendant to the effect that he had moved out of 317 Tillman and into 3565 Chesapeake; (b) terse, out-of-court statements

---

[13] Though not the heaviest of burdens, the preponderance standard is not insignificant, and if the Court finds that the party in question—be it a defendant or the Government—has not met it, the Court must say so.

from one other person (with an unspecified basis of knowledge) that Defendant was "staying" at 3565 Chesapeake and had a relationship a woman who perhaps resided there; (c) testimony that Defendant possessed a key to a room inside 3565 Chesapeake Drive in which officer found a photograph of Defendant and items suggest a possible connection to drug-trafficking operations; (d) and testimony regarding the discovery of items at 317 Tillman suggesting that Defendant possibly still could be staying overnight there.

This evidence is insufficient to establish by a preponderance of the evidence the proposition that Defendant was an overnight guest at the address or that he used the premises for a predominantly personal or social, rather than business, purpose.[14] Indeed, categories (c) and (d) plainly are inconsistent with this proposition, except for Defendant's photograph—but even that is explainable as a keepsake not of Defendant in the capacity of overnight guest, but rather of Defendant as (illicit) business operator or of the apparent resident-mother who was reportedly dating Defendant.

As for Defendant's claim to have moved recently to 3565 Chesapeake from 317 Tillman, he made that statement at a time when he had a substantial incentive to try (even if hopelessly) to distance himself from 317 Tillman Lane because at the time a search was imminent and heroine was located there, just waiting to be found immediately. Moreover, from Defendant's text messages, there is reason to believe that Defendant was interested in keeping relevant information and evidence from the authorities. (Tr. at 23, 52-53, 115-16). In short, in this context, Defendant's

---

[14] The Court further notes that the subjective impression of Detective England, or any other the other officers, that Defendant was staying (or living) at the Chesapeake address is not dispositive of the Court's analysis. *See United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009) (holding that to establish standing the defendant must show that he had a subjective expectation of privacy and his expectation was objectively reasonable).

claim of moving to 3565 Chesapeake is—though not inherently incredible or necessarily untrue—not reliable based on the current record.[15]

Finally, the hearsay statements of the twenty year-old are not reliable either, given their lack of specificity and foundation of knowledge. They cannot reliably stand for the proposition that Defendant was "staying" at 3565 Chesapeake, let alone staying there to the degree and in the manner to engender a legitimate expectation of privacy in the premises. It is certainly possible that he was, but the Court cannot conclude that he was, because this has not been established by a preponderance of the evidence.[16]

The Court would be applying speculation to the present record if it found otherwise. *See United States v. Castellanos*, 716 F.3d 828, 833 n.4 (4th Cir. 2013) (emphasizing that "it is not the duty of the court or the government to make [the defendant's] reasonable expectation of privacy case for him"). Accordingly, because he lacks Fourth Amendment standing with respect to 3565 Chesapeake Drive, Defendant's motion to suppress the evidence from will be denied.[17]

---

[15] In reaching this conclusion, the Court does not mean to indicate that it has concluded that Defendant lied during the incident in question or that his statements are unreliable as a general matter. The Court also wishes to emphasize that this Memorandum Opinion is intended for the sole purpose of resolving the instant suppression motion, and that nothing herein affects Defendant's presumption of innocence at trial or the Court's firm recognition of the same.

[16] The Court notes, however, that what is good for the goose is good for the gander: just as it does not establish Defendant's legitimate expectation of privacy in the premises at 3565 Chesapeake, the evidence of record is imperfect in connecting Defendant to the contraband and other incriminating items found at 3565 Chesapeake. This is not lost on the Court, which does not mean to suggest that, while Defendant has not adequately connected himself to 3565 Chesapeake for his purposes (standing on this motion to suppress), the Government necessarily has connected (or will connect) Defendant to the items at 3565 Chesapeake adequately for its purposes.

[17] Because the Court denies Defendant's motion to suppress the items found in 3565 Chesapeake Drive for lack of standing, the Court will not address Defendant's additional arguments in support of his motion to suppress the evidence seized at 3565 Chesapeake Drive. The Court also clarifies that Defendant's argument about the officers' seizure of Defendant's keys relates to the suppression of evidence found at 3565 Chesapeake Drive and not the suppression of the keys themselves. *See* Doc. No. 48 at 15 ("Therefore, it was unlawful for them to seize that key and use

## III. Defendant's Statement

Defendant argues that his statement to Officer Pasqualetto that he moved to a new address should be suppressed because Officer Pasqualetto did not read Defendant his *Miranda* rights before Defendant made that statement. However, the evidence in the record demonstrates that Defendant's statement was not the result of a custodial interrogation, as Defendant volunteered that he had been staying elsewhere, and therefore Officer Pasqualetto was not required to advise Defendant of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.") Officer Pasqualetto credibly testified that he did not ask Defendant where he was living. (Tr. at 150, 160-61.) On the contrary, Officer Pasqualetto was under the impression that Defendant was residing at the Tillman address until Defendant volunteered that he had been staying somewhere else during their conversation. Officer Pasqualetto testified, "[Defendant] told me that he was not living there, he moved out two weeks ago. Kind of spontaneous statement." (Tr. at 150.) Moreover, this statement occurred before the search of 317 Tillman Lane and before Defendant waited while the officers performed the search of that address. The Court finds no viable basis to discount Officer Pasqualetto's testimony on this issue. Accordingly, because *Miranda* protections did not apply to

---

it in their investigation of Shelton in a hunt for additional crimes. Accordingly, evidence found from the Chesapeake residence should be suppressed for this reason alone.").

16

the statement Defendant seeks to suppress, as it was not made in response to a question from law enforcement,[18] the motion to suppress that statement will be denied.[19]

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (Doc. No. 47) will be denied. An appropriate order will be entered.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[18] The Court further notes that the record establishes that Defendant is required, under his parole conditions, to provide accurate address information to his parole officer, gain the permission of his parole officer before moving, and, "carry out all lawful instructions [his parole officer] gives and report to [his] parole officer as instructed . . . " (Tr. at 95-97; Government Exhibit 1.) Defendant is also required to submit a Monthly Reporting Form which requires him to give an updated residential address. (Tr. at 98-99; Government Exhibit 2.) Implicit in these conditions is that Defendant has a requirement to inform his parole officer of his residential address and that Defendant does not have to be provided his *Miranda* rights for his parole officer to ask for his address.

[19] Defendant, for the first time in his post-hearing brief, also appears to move to suppress all statements he made in response to officers' questioning during the searches because he was in custody and not advised of his *Miranda* rights. Defendant specifically states, "if Pasqualetto or any other parole or police officer conducted a custodial interrogation of Shelton, he/she was required to notify Mr. Shelton of his *Miranda* rights." However, Defendant does not sufficiently develop this argument. For example, he does not identify the custodial interrogation or statements to which he is referring. Accordingly, the Court will not address this argument. *See United States v. Griffith*, 408 F. App'x 963, 967 (6th Cir. 2011) (applying the longstanding rule—that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed legal argumentation, are deemed waived—to a criminal case).